Good afternoon. May it please the Court, Mr. Weisberg. My name is Christopher Gibbons. I represent Commonwealth Edison in this matter. I'd like to reserve a minute or two for rebuttal. We are here today to ask you to reverse the Circuit Court's affirmance of the Industrial Commission's or Workers' Compensation Commission's decision in this case. This is one, in fact, where the decision is against the manifest weight of the evidence. I tried this case and I thought the arbitrator did a nice job of sorting through what was a complicated and lengthy medical history and factual summary. This claimant was injured his shoulder while working for us. A couple years later, we sold that plant to Midwest Generation. He stayed on and worked there in the same job, doing the same duties at full duty, and then down the road, as you know, developed, came under the care for his cervical condition and had surgery. At trial, the arbitrator awarded a percentage, a very high percentage, lawsuits to the arm, 65%. We had paid all the medical and lost time associated with his shoulder condition, and that was a good decision. On review, I believe, on very thin evidence, the Commission added to the award, and the Commission found claimant's cervical condition related. They added to the award $95,000 in medical bills that had, in fact, been paid through the claimant's group health insurance with his subsequent employer. We don't get a credit for that because it was not our group health insurance. So that's a $95,000 windfall to the claimant. They also added TTD associated with the cervical surgery and an additional 17 1⁄2% lawsuits to the person as a whole. And an additional 17 1⁄2% or an additional 6 1⁄2% to the right arm, the extra? I'm sorry, Your Honor? Well, the arbitrator awarded 6 1⁄2% of the right arm. 65%. 65%. Right. Which, for two shoulder surgeries and a full duty return to work, is a very heavy award. But he was denying the rest of their claim, and I think he was dispensing or he was deciding in that fashion, and we accepted that. Are you arguing there's no causal connection? What's the reduced or simplest terms? Yes. Okay. Simplest terms for no causal connection between this incident and the cervical surgeries, he wonder when, years later, is that he didn't hurt his neck in this accident. All the contemporaneous records, his histories to the doctor, accident report and so forth describe a shoulder injury. He grabbed the bumper of his truck when he slipped on ice, and he kept working that day. In fact, he kept working for several days, but went in then to see the doctor complained of shoulder pain. He had previous, before this accident, had medical treatment and along with tingling sensory complaints in that arm for many years prior to this accident. All right. That leads to the next point I was going to make. What about the argument that the employment need not be the sole or the only cause of the claimant's condition of ill-being as long as it is a causative factor? What about the argument this aggravated a preexisting condition? There's the factual and medical evidence that, in fact, he did injure his neck or aggravate a preexisting neck condition isn't there, if you look closely at the record. In fact, I'll agree, there is, as we say in our brief, some tiny bit of evidence. But it doesn't amount to enough to even qualify as being within the manifest way of the evidence. And let me follow up on that. Didn't Dr. Koh opine that it was causally connected? Dr. Koh did opine it was causally connected. And when asked what his opinion was based on, he said that there was the first complaint of neck pain coming one year to 18 months after the alleged accident. And that there were some sensory complaints in the right arm which were consistent with his preexisting complaints. But according to him, became unceasing and changed in nature after this accident. The underlying facts don't support that. And as you know, when an opinion is based on speculation, when the underlying facts don't support that opinion, it can't carry the day. And that's exactly the case here. Dr. Koh, he said those words, but the facts don't support it. Well, the Commission believed Koh, did it not? The Commission did. And aren't they free to believe Koh? Well, I mean, obviously, they did what they did. But I don't think they should have, and that's why we're here. And let me point out why. The Commission Let me ask one other thing. Sure. The claimant testified, didn't he, that when he fell and grabbed the back of the pickup, he hit his head on the tailgate as well, right? He did, Your Honor. And that was the first time that that evidence came up. The records at the time of the incident don't even say he fell to the ground. It said he slipped and grabbed himself on the bumper and hurt his shoulder. So his description at trial was he slipped, he grabbed the bumper, his feet went straight up in the air, and he whacked his head against the back of his truck. There was no evidence back when it occurred that that was the case. There was no treatment to his head, there was no bruising, there was no complaints of neck pain. There was nothing to indicate at the time that he hurt his head or his neck in this accident. But that's what he described at trial. And that's where we say the Commission got it wrong, completely wrong, when they found that he hurt his neck. The first complaint of neck pain in the medical records comes on April 11th with Dr. Dieman's records. It's not a complaint of neck pain, but the Commission picked up on it, and it's this sort of speculative. Commissioner Lindsay pointed it out in her dissent. It was this exact sort of speculative going out and turning the whole decision on it that is what we think was overreaching. So Dr. Dieman's note is for treatment of the shoulder. He complains of shoulder pain. He diagnoses him with subacromial bursitis, and he does an exam of his neck and his shoulder. His neck finding was that the neck was supple. There is a note in there when he's examining the shoulder that there was some cervical tenderness. The diagnosis on that day was solely to the shoulder, and the complaints were of shoulder pain with no other complaints. And the note includes the words cervical bursitis. There is no bursa in the cervical spine, as Dr. Ghanem pointed out. So the term is either a mistake in the dictation from subacromial bursitis, which appears otherwise in his records, which is probably the case, or I don't know what else. I don't have an explanation, because there's no such thing as cervical bursitis, whereas he was being treated actively for subacromial bursitis and impingement syndrome on the shoulder. So to take that, Your Honor, to take that tiny fact, the word cervical bursitis, and to use that to base a surgery four years later to a totally different section of the spine, low down in the cervical spine, is speculative. And Dr. Koh. Let me ask you this, counsel. Yes. What about in the case, and this is always an interesting question, where the record permits of two equally plausible inferences. The record establishes a plausible inference that the condition of ill being was causally connected to the accident. The other equally establishes it was not. And the commission finds in favor of the claim. Who should win an appeal? In that scenario, if there's equal inferences under the manifest weight of the evidence standard, I would say the, you know. The award should stand, right? The award should stand. That's not the case here. The facts are so one-sided here. In fact, this decision is against the manifest weight, in my opinion. And here's the reason. You've got that one note of a confusing note of cervical tenderness. Otherwise, you have no indication of a neck injury. You have no indication of neck trauma. And you have no diagnosis of a neck issue. Except for Koh. You keep ignoring Koh. Well, I'm not ignoring. I am. I think it's interesting they're relying on Koh. They, of course, didn't have any of the treaters testify or secure any reports. I'm not ignoring Koh. I'm saying Koh's report is clear. He's saying something's related with the complaint of cervical pain one year later. I don't think that carries it. I mean, we have to go on common sense. And this Court has many decisions where they've said even though there's an opinion by a doctor, if the underlying facts are so contrary, they're not going to follow that opinion. I think that's exactly the case with Dr. Koh. A couple other points I wanted to mention. As it relates to the cervical spine, the commission relied on the argument that he was in a prior state of good health and a subsequent state of ill health after this accident. The facts don't support that. As it relates to sensory complaints down the arm, he was in a prior state of ill health with regard to the right arm. And after the accident, that continued to be pretty much along the same, of the same character, duration and type of complaints until a couple of years later after he returned to work at full duty at Midwest, at Midwest Generations. So that's simply not the case. This man did work at full duty for several years, doing heavy work. There is no ill health or good health accident ill health. Thirdly, or fourthly, the commission relied specifically in their decision on the fact that the claimant testified he told his doctors the truth. And of course, the histories at the time of the accident don't contain a history of a neck injury or head trauma or neck trauma. But then at trial, we got into the whole thing about him testifying that he was really only working half days while getting paid for full days. And so he had told his same doctors that his neck was hurting him because he was working so many hours at Midwest Generation. This is during the time when he was at full duty. Okay, so what is it? He told his doctors the truth, that he was working tons of hours at Midwest Generation, and he lied in open days, or he was lying to his doctors, at which point the commission's reliance on his being honest with his doctors falls and shouldn't stand. And so we have a guy who wasn't credible. I mean, he clearly was not a credible witness, and his contradictory testimony is unimpeachable. Or rather, it was impeached. So for those reasons, we are asking that you find this decision against the manifest way to the evidence and reverse the circuit court. Thank you. Counsel, please. Good afternoon, Justices, Mr. Gibbons. My name is Mark Weisberg from Horwitz & Associates, and I represent Mr. Cussell. Counsel has brought up throughout multi-levels of this proceeding the half-day, full-day conundrum. And all I can say to that is, if someone offered me the deal that I could work a half-day and be paid a full day, I'd take that deal. I don't think that it tells us much about credibility. It tells us about the fact, which was testified to, that he had a family to support. And if he was in too much pain to work a full day and his farm was offering him the ability to work a half-day and get paid for that full day so that he could support his family, I don't think any one of us would have said no to that. Counsel points out that we utilized the expert testimony of Dr. Coe rather than a treating doctor. What he doesn't point out is that they also didn't go to a treating doctor. If it was so obvious that there was no causation here, why not call one of the treating doctors to testify to that fact? They talk about thin evidence. It's not thin evidence. He wasn't actively treating before this accident for the cervical spine. He has this accident. Even their own expert, Dr. Ganiam, admits that this accident is something that would be a competent cause of a cervical injury, although he minimizes it and says it would be a cervical strain. Well, it doesn't take a huge leap to say if it could cause a cervical strain, it could cause a more serious injury to the cervical spine. Obviously, counsel is telling us the awards against the man have persuaded the evidence. In addition to Dr. Coe's opinion, what evidence can you call our attention to that supports the commission's finding? My recollection is that Dr. Gupta had in his treatment notes that the surgery was for treatment of a work-related injury. I also think that if you just kind of follow the trail, it's not that uncommon for us to see neck-shoulder cases where one or the other is creating more pain, they focus the treatment on that. In this case, they focused treatment on the shoulder. He underwent two surgeries, still had symptoms. Then when they finally got around to treating the neck, then he finally has some relief, not complete relief, obviously, but some relief from those symptoms. I think that tells us more than all the expert opinions and everything else. They treated the shoulder. There were problems with the shoulder, but the pain that he was experiencing was also being caused by the cervical condition, which was aggravated at the time of this fall. And it makes logical sense. It's supported by what Dr. Coe is saying. It's even supported by what Dr. Gupta is saying. It's supported by what Dr. Ghanayam is saying to an extent, to the extent that he's willing to admit, yes, falling backwards like this and reaching out and grabbing with your hand, yes, that could cause a cervical strain. He didn't want to go that extra step and say, and I think it caused this condition. But he also seemed not to be entirely familiar with what the findings were in the second MRI. And the findings in the second MRI are very important. He also didn't seem to be familiar with who did the surgery, raising the question of whether he'd even reviewed the surgical report and the surgical findings. So there were some serious problems with the opinion of Dr. Ghanayam, whereas Dr. Coe very clearly had reviewed all the medical evidence. One can quibble as to whether the cervical symptoms began three months after this accident or more time after that. It's clear from Dr. Coe's opinion that there is nothing inconsistent with those symptoms being masked or superseded by the shoulder symptoms, and there's nothing wrong with addressing those shoulder symptoms, and there's nothing wrong with addressing the shoulder symptoms, and then once that seemed to not take care of the pain, addressing the cervical issues. Does it hurt you that there seems to be no contemporaneous report of hitting the head against the bumper? I don't think that at this level of review it hurts me. I think that we all wish that we walked in here with a perfect case, but if we had a perfect case, we wouldn't be walking in here. So do I wish I could be standing next to the guy and taking pictures and telling him what to do with the doctors? You bet. Do I ever have someone who comes in and really gives a great history? It's pretty rare. Most people, they just want to get better. They're not focused on workers' compensation. They're not focused on the legal issues, and likewise the doctors. I've had doctor after doctor testify to me, you know, you lawyers come in here and you're talking about causation. That's meaningless to us in terms of our treatment of the patient. We don't care what happened. What we care about is what are the symptoms and how do we make them better. So what they're going to take down, or he was in the bathtub at home, doesn't make a difference to the doctor. What they're going to take down are the things that are crucial to their treatment of that patient. And do I wish that he'd gone in and said, ow, my neck? You bet. But three months later, there's already a mention of the neck. Whether it's cervical bursitis or whatever it is, Dr. Dieman is already addressing a complaint to the neck. Then that fades away as they focus on the shoulder treatment. But I think it's clear that this was a serious issue. And until this accident happened, we've got a qualified expert testifying that, yes, the records are consistent with this being an aggravation of that cervical condition necessitating the surgery. Are you saying condition? Is there such a thing as cervical bursitis? I'm not qualified to say that there is or there isn't. All I can say is that he was ultimately diagnosed with a condition that was treated. And I don't think anyone is contesting that that ultimate diagnosis is an accurate diagnosis or that the treatment was proper. I think Dr. Ghanayam's opinion was that the surgery wasn't appropriate for the work-related condition, but I don't think that even he was contesting that the surgery was needed for that condition. If there are no further questions, thank you. Thank you. Just several quick points. Dr. Dieman did not address in a medical sense the cervical spine once he came under his care. He treated the shoulder. His records all relate to a shoulder treatment. He rendered no treatment to the cervical spine. He had one note of tenderness on examination of the shoulder. We do rely on initial histories in workers' camp because most people at the time of the accident were in their early 20s or early 30s. They have an injury, want to get better. That's why they're deemed reliable. In this case, the initial histories contain no complaint of a neck injury or neck pain, which is one reason why the decisions against the manifest wait. Mr. Weisberg would tell you he doesn't know if the first complaint came three months or a year later. It doesn't matter. We disagree. I mean, how do we know someone hurt their neck in a work camp case? It's by looking at what happened at that time and what their complaints and treatment were following the injury. It's extremely relevant. And the idea that you hurt your neck by banging it against the bumper of a truck and you don't have a complaint of neck pain for three months is patently ridiculous. And yet, that's what the commission in essence decided in this case when they added on, in my opinion, gratuitously, to this man's award. So a close review of the facts, I think, shows you can distinguish between neck pain and shoulder pain. It's not a matter of pain. Neck pathology and shoulder pathology, that's what doctors do. That's what the doctors did in this case. And in this case, they treated his shoulder following his shoulder injury. Four years, five years, six years later, treatment to the neck is unrelated to that incident. Thank you.